Jordan S. Stanzler (SBN 54620)
STANZLER FUNDERBURK & CASTELLON LLP
2275 E. Bayshore Rd., Suite 100
Palo Alto, CA 94303
Telephone:    (650) 739-0200
Facsimile:    (650) 617-6888      E-filing

Attorneys for Plaintiff
LARY W. GREMP

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

LARY W. GREMP,                    CV ) 08 No.   2303

      Plaintiff,           )                    EDL

      v.                   )       COMPLAINT

SARAH LITTLE; PATRICK TAYLOR; GLENN )
H. VAN SCHAACK; KATHLEEN DELOE,    )
SONOMA COUNTY and BILL COGBILL, in his )
capacity as Sheriff of Sonoma County,    )

      Defendants.          )       BY FAX

---

**INTRODUCTION AND JURISDICTION**

1.    This action is brought under 28 U.S.C. section 1331 and 42 U.S.C. section 1983 for injuries caused by false arrest, false imprisonment, and malicious prosecution. Venue is proper in this district since some of the defendants reside here and most of the acts complained of took place here. There is pendent jurisdiction over related state law claims, under 28 U.S.C. §1367(a).

2.    Plaintiff Lary W. Gremp is a resident of Stanislaus County, California where he is the principal auctioneer of Modesto Livestock Commission Company, Inc. ("Modesto Livestock"). Modesto Livestock is a small family-run business that has been conducting auctions of livestock since 1939.

Complaint

3. Sarah Little is or was an employee of the Sonoma County Sheriff's Department.

4. Patrick Taylor is an employee of the State of California.

5. Glenn H. Van Schaack is an employee of the State of California.

6. Kathleen DeLoe was a prosecutor in Sonoma County.

7. Sonoma County is a county in Northern California.

8. Bill Cogbill is the Sheriff of Sonoma County. He is sued in his official capacity only.

9. In a typical auction Modesto Livestock auctions cattle and pays the proceeds to the buyer. As another part of the business, Modesto Livestock also purchases cattle for its own account, delivers the cattle to a rancher who will raise the cattle, later sells the cattle at auction, and then pays the rancher from the proceeds of the auction.

10. Modesto Livestock entered into a verbal agreement with a rancher named Vic Chiapetta ("Chiapetta"), under which the parties agreed as follows: Modesto Livestock would purchase cattle at auction, and transfer them to Chiapetta to raise. Chiapetta would bear the costs of raising and feeding the cattle. Chiapetta would later deliver the cattle to be sold at an annual auction at the Muelrath Ranch in Sonoma County. Modesto Livestock would be paid a commission for selling the cattle and Chiapetta would receive the balance of the proceeds.

11. In accordance with the agreement, Modesto Livestock purchased cattle for itself on May 8, 1995 at an auction that it conducted, and transferred those cattle to Chiapetta to raise.

12. At that auction Modesto Livestock acted both as an auctioneer and a dealer, or purchaser of cattle. When Modesto Livestock acted in dual capacities, as both auctioneer and dealer, it maintained separate accounts. One account, called the "Dealer Account," was maintained to reflect the purchases which Modesto Livestock made as a "dealer" or "purchaser" of cattle. The other account was called the "Custodial Account," which reflected the activities of Modesto Livestock as an auctioneer.

13. On or about May 8, 1995, Modesto Livestock generated different documents in the regular, ordinary course of business, to reflect its dual capacities.

Complaint                                    2

14.    One set of records reflected that Modesto Livestock acted as auctioneer; and another set of records reflected that it acted as purchaser of cattle.

15.    Modesto Livestock generated an invoice to reflect that it had purchased cattle on its own account as a purchaser ("dealer") of cattle.

16.    Modesto Livestock Commission wrote an invoice dated May 8, 1995 stating that 40 head of cattle were "Sold to Modesto Livestock Comm. Co./ Destination – Chiapetta Ranch – Petaluma, Ca.". The invoice further states: "The purchaser of livestock listed below agrees that title of said livestock shall be retained by Modesto Livestock Commission Co. until check or draft is paid. We act as agents only. All responsibility ceases when sale is made." See Exhibit 1.

17.    As discussed more fully below, Lary Gremp was subjected to a false arrest many years later – in 2006 – on grounds that this one invoice was a false and forged document. It was not. The document reflected the absolute truth – that Modesto Livestock purchased the cattle at its own auction, for delivery to the Chiapetta Ranch. The cattle were in fact sold to Modesto Livestock at the auction in question.

18.    As discussed more fully below, certain of the defendants knew the correct facts, but prepared documentation in support of an arrest warrant which contained facts they knew to be untrue. The false statements made in support of the arrest

warrant included the false statements that Modesto Livestock was not the true owner of the cattle and that Gremp had presented false documents to obtain ownership of cattle that he did not own.

19.    Both Modesto Livestock and Chiapetta agreed and understood that Modesto Livestock owned the cattle, that they were being transferred to Chiapetta to raise, that Modesto Livestock had the right to sell the cattle at auction, and Modesto Livestock had the right to retain the proceeds of the sale which would then be paid to Chiapetta according to their agreement.

20.    On or about September 29, 1995 Gremp allegedly faxed the invoice attached as Exhibit 1 to state brand inspector Maureen Doherty.

21.    The sale of the cattle was scheduled to take place at March 1, 1996 at the Muelrath Ranch in Sonoma County. Before the auction and sale, Chiapetta demanded that

Complaint                                           3

1 | Gremp pay Chiapetta his costs for raising the cattle. Chiapetta apparently believed that the cattle
2 | were going to be sold at a loss. Chiapetta therefore demanded that Gremp pay him for the feed
3 | costs, before the auction took place. Under the agreement between Modesto Livestock and
4 | Chiapetta, it was the responsibility of Chiapetta to raise the cattle and pay for their feed. To put
5 | leverage on Gremp, Chiapetta refused to produce the cattle to be sold at auction unless he got
6 | paid first.

7 |      22.   Chiapetta contacted a state livestock brand inspector, Maureen Doherty, to
8 | intervene on his behalf. Chiapetta complained that Gremp owed him money for the cost of
9 | feeding the cattle and wanted to hold up the sale until he was paid.

10 |      23.   The brand inspector intervened and threatened to hold up the sale until Gremp
11 | paid Chiapetta the disputed bill. The brand inspector demanded that Chiapetta provide proof of
12 | ownership of the cattle. Chiapetta showed the inspector an invoice (Exhibit 2) which the
13 | inspector mistakenly assumed and mistakenly understood proved that Chiapetta owned the cattle.
14 | If Chiapetta was the owner, it made no sense that Chiapetta would be demanding payment for
15 | feed from a buyer.

16 |      24.   Gremp protested to no avail that the cattle belonged to Modesto Livestock.

17 |      25.   In an attempt to persuade Doherty that Modesto Livestock was the true owner of
18 | the cattle, Gremp asked Doherty for proof of payment by Chiapetta and asked her to determine
19 | whether the invoice which Chiapetta showed Doherty had the notation "paid" on it or not.
20 | Doherty replied that perhaps Gremp had made a gift of the cattle to Chiapetta.

21 |      26.   Doherty requested that Modesto Livestock show proof of ownership. Modesto
22 | Livestock allegedly faxed to Doherty the invoice attached as Exhibit 1 on February 29, 1996.

23 |      27.   The State brand inspector Doherty then intervened in the dispute between Gremp
24 | and Chiapetta by insisting that Gremp would have to resolve the problem and pay Chiapetta
25 | what Chiapetta demanded; otherwise the sale would not be allowed to proceed.

26 |      28.   Erroneously assuming that Chiapetta was the owner of the cattle, the State brand
27 | inspector asked or required Chiapetta to fill out a bill of sale, transferring the cattle to Modesto

28

Complaint                                           4

1  Livestock, so that the sale could proceed.

2      29.    Gremp reluctantly wrote Chiapetta a check for the amount he demanded.

3  Chiapetta in turn signed two documents entitled "Bill of Sale or Consignment" on February 29,

4  1996, under penalty of perjury. (Exhibit 3). The documents stated that  the cattle in question had

5  been either sold or consigned to Modesto Livestock.

6      30.    These were false, perjurious statements signed by Chiapetta, since he did not own

7  the cattle and had no cattle to sell or to consign to Modesto Livestock.

8      31.    Thereafter, on October 16, 1996, defendant Taylor, who was then employed by the

9  State of California, Department of Food and Agriculture, Bureau of Livestock Identification, sent

10  an unsworn report to the Sonoma County Sheriff's Department, accusing Gremp of the crime of

11  "falsifying records" under Penal Code section 115 (A) and "F & A 21709-21710". Taylor

12  described the offense as follows: "On or about September 29, 1995 and February 29, 1996 Lary

13  Gremp provided a falsified bill of sale to Inspector Doherty, as proof of ownership of 40 heifers

14  at Robert Muelrath Ranch, Sonoma County"and further described the motive as follows: "To

15  obtain lawful possession of forty heifers previously sold to Vic Chiapetta."

16      32.    On information and belief, Van Schaack personally approved the memorandum

17  submitted by Taylor and approved the statement made by Taylor.

18      33.    Taylor wrote a memorandum which accompanied the report to the Sheriff's

19  Department. The memorandum contained a "Summary" which stated  "that Modesto Livestock

20  Commission Co. completed an invoice (outbilling) showing Chiapetta as the purchaser of the

21  heifers on May 8, 1995 and that Chiapetta is therefore the owner"; and that the invoices which

22  Gremp faxed or showed to Doherty "were proven to have been falsified by an audit conducted

23  by the Packers and Stockyards Administration".

24      34.    In another part of the report entitled "Investigation", Taylor stated that the invoice

25  which Chiapetta showed to Doherty "confirmed that Chiapetta had purchased the 40 heifers and

26  was therefore the owner."

27      35.    Taylor further stated that "On May 22, 1996, at the request of Bureau of Livestock

28

Complaint                              5

1  Identification, California Department of Food and Agriculture, Jim Morcaldi of USDA, Packers

2  and Stockyards Administration, conducted an audit of the records of the sale on May 8, 1995.

3  His audit confirmed that the invoice that was in Chiapetta's possession was the original invoice

4  and the invoices presented by Gremp on two different occasions were falsified. A copy of the

5  summary of the audit is enclosed as Exhibit 8."

6       36.    Taylor and Van Schaack knew that the statements in his report and memorandum

7  were false. Taylor and Van Schaack knew that Modesto Livestock was at all times the owner of

8  the cattle and that Chiapetta was never the owner of the cattle. They also knew that the audit of

9  the Packers and Stockyards Administration did not "prove" that Gremp "falsified" the invoices

10 in question.

11      37.    Taylor and Van Schaack also knew that Gremp had no motive to present a false

12 document showing that he owned the cattle, since Gremp's company always owned the cattle.

13      38.    Taylor and Van Schaack also knew that there was nothing false in the document in

14 question (Exhibit 1) in which Modesto Livestock recorded that it sold cattle to itself on May 8,

15 1995.

16      39.    Taylor and Van Schaack also knew, or was deliberately indifferent to, the fact that

17 Chiapetta had filed a false statement, under penalty of perjury, when Chiapetta signed the Bill of

18 Sale or Consignment.

19      40.    On November 19, 1996 Sgt. Lopez of the Sonoma County Sheriff's Department

20 filled out a "Crime/Incident Report" in which he stated that " I was informed the Susp. Falsified

21 bills of sale and presented them more than once to the State brand inspectors office on 9-29-96/

22 2-29-96 at the Muelrath Ranch, Santa Rosa. The Susp. then obtained livestock based on the

23 provided documents. Follow-up investigation revealed the Susp. Forged or altered information

24 previously provided to the State."

25      41.    On or about February 11, 1997 defendant Kathleen DeLoe, the Chief Assistant

26 District Attorney of Sonoma County, wrote a memorandum to Detective Richard York, of the

27 Sonoma County Sheriff's Office, noting that "I finally went through this report [presumably

28

Complaint                                    6

1 | referring to the materials sent by defendant Taylor] with a fine tooth comb." DeLoe asked a

2 | number of questions and made the following comment: "A summary of what facts prove the

3 | violations is needed. It is obvious several invoices were drafted but which is the forgery? Is there

4 | any evidence that Chiapetta forged or falsified any of these documents?"

5 |      42.    On February 27, 1997 Glenn H. Van Schaack, Chief, Bureau of Livestock

6 | Identification, State Department of Food and Agriculture, responded to Detective York and

7 | answered the questions posed by Ms. DeLoe. Van Schaack confirmed that "MLCC paid for these

8 | heifers and Chiapetta did not." Nevertheless, he maintained that "this fact has no bearing on the

9 | case." He maintained that the cattle "were sold to Chiapetta as evidence by the salesyard

10 | invoice" (Exhibit 1 ). The conclusion that the invoice was a "bill of sale", or was evidence of a

11 | sale to  Chiapetta was patently unreasonable, since there is nothing on the invoice (Exhibit 1)

12 | that mentions a sale to Chiapetta; rather, it indicates a "sale" from Modesto Livestock to itself.

13 |      43.    On or about May 7, 1997 DeLoe made wrote a memo concerning a meeting she

14 | had with Glen VanSchaack, Chief, Bureau of Livestock Identification, State department of Food

15 | and Agriculture "concerning this case and whether we can file anything against Lary Gremp."

16 |      44.    DeLoe wrote in part:

> 17 | Gremp and Chiapetta agreed that Gremp would buy 40 head of cattle, transfer them to Chiapetta (which he did), Chiapetta would fatten them up (pay feed etc bills), then they would sell them, pay their expenses and split the difference. When the dispute arose over who owned the cattle (Gremp was demanding return of the cattle  so he could sell claiming they were his and didn't want to pay Chiapetta for feed), Gremp gave a check to Chiapetta for approximately $13,000, Chiapetta transferred the cattle to him, gave him bills of sale and then Gremp promptly stopped payment on the check....
> The presentation to Inspector Doherty of the two false invoices on 9/29/95 and 2/29/96 were violations of PC 115. Once Doherty took these two copies into her possession they became a document filed with a public office.
> There are misdemeanor codes sections also violated F&A 21709 and 21710 but are beyond the S/L. If def. Wishes [sic] to plea bargain we will offer him those misdemeanors, he needs to waive all regularities.

24 |      45.    In writing the February 11, 1997 memorandum, interviewing Van Schaack, and

25 | writing the May 7, 1997 memorandum, DeLoe performed the function of an investigator, indeed,

26 | the sole investigator, for Sonoma County. The Sonoma County Sheriff's Department conducted

27 | no investigation of substance into the facts concerning Gremp, and no other employee of the

28 |

Complaint                           7

1  County conducted any investigation of any substance. DeLoe investigated whether the facts

2  asserted by Taylor were true. In doing so, she conducted a flawed investigation that was

3  deliberately indifferent to the true facts.

4          46.    DeLoe knew and understood that Modesto Livestock had not sold cattle to

5  Chiapetta, that Chiapetta never owned the cattle, and that Modesto Livestock always owned the

6  cattle

7          47.    DeLoe therefore knew that there was nothing false whatsoever in the invoice

8  which Gremp faxed to Doherty ( Exhibit 1), showing that Modesto Livestock sold cattle to itself

9  on May 8, 1995.

10         48.    On or about June 9, 1997 DeLoe nevertheless prepared documentation in support

11 of an application for a warrant for arrest of Gremp on felony charges, to be submitted to a

12 judicial officer.

13         49.    On or about June 10, 1997, Sarah Little signed a "Warrant-Felony Complaint,"

14 and submitted doccumentation in support of the "Warrant-Felony Complaint" to a judicial

15 officer.

16         50.    The documentation consisted of a Warrant sworn to by Sarah Little of the Sonona

17 County Sheriff's Department, a "Crime Incident Report of the Sonoma County Sherriff's

18 Department" dated November 19, 1996 and the report of Patrick Taylor dated October 16, 1996

19 and his "Summary" and "Investigation" referred to above.

20         51.    The documentation also included a page, apparently written  by Taylor,  which

21 stated in part:

22              What is clear is:

23              1.    Modesto Livestock Comm. Co. paid for the livestock.

24              2.    At least three different invoices were made by Modesto Livestock Com.

25                    Co. for the livestock in question.

26              3.    Chiapetta did not pay for the livestock.

27              4.    Chiapetta billed Gremp for raising the livestock.

28

Complaint                                    8

1    52.    Defendants knew that Sarah Little and/or the County were submitting false

2    information to a judicial officer as part of the investigation into the matter; or were deliberately

3    indifferent to the true facts.

4    53.    Defendants knew that Modesto Livestock always owned the cattle and that

5    Chiapetta never owned the cattle. Defendants also knew that Modesto Livestock paid for the

6    cattle and that Chiapetta did not pay for the cattle.

7    54.    Defendants nevertheless included in the documentation sent to the judicial officer

8    the false statements of Taylor in his report, "Summary"and "Investigation", referred to above, in

9    which Taylor stated falsely that Chiapetta was the purchaser of the cattle, that Chiapetta was the

10    owner of the cattle and that an audit confirmed that the invoice in question (Exhibit 1) was

11    falsified.

12    55.    Defendants knew that these statements of Taylor were false or was deliberately

13    indifferent to their falsity.

14    56.    Defendants were, at a minimum, deliberately indifferent to the true state of facts,

15    that Modesto Livestock purchased the cattle; that Chiapetta did not purchase the cattle; that

16    Modesto Livestock always owned the cattle; and that the invoice (Exhibit 1) was not a false bill

17    of sale, but a true bill of sale.

18    57.    Defendants were, at a minimum, deliberately indifferent to the false statements

19    about "motive" which Taylor wrote in his report and which Little forwarded to the judicial

20    officer. Defendants knew that the "motive" reported by Taylor – that Gremp was seeking "To

21    obtain lawful possession of forty heifers he had previously sold to Vic Chiapetta"– was a false

22    statement, since the heifers had not been sold to Chiapetta.

23    58.    Defendants knew that the heifers had not been sold to Chiapetta. Defendants

24    were deliberately indifferent about describing the true facts to the judicial officer.

25    59.    Defendants were deliberately indifferent to investigating the true facts and

26    supplying the judicial officer with the totality of records which showed that Modesto Livestock

27    had purchased the cattle. For example, Defendants did not include in the documents submitted

28

Complaint    9

1    to the judicial officer the totality of the facts showing that Modesto Livestock had paid for the

2    cattle by writing checks to itself at the time the cattle were purchased.

3        60.    Defendants were deliberately indifferent to the fact that Modesto Livestock

4    always owned the cattle.

5        61.    Defendants were deliberately indifferent to the investigation of the books and

6    records of Modesto Livestock, since neither the County nor the State of California nor their

7    agents conducted an audit or inspection of Modesto Livestock's books and records.

8        62.    Instead, Defendants relied exclusively upon an audit conducted by Jim Morcaldi

9    of the United States Department of Agriculture ("USDA"), but they were deliberately indifferent

10   to the true facts when describing the audit conducted by Morcaldi.

11       63.    Defendants were deliberately indifferent as to what documents Morcaldi had

12   actually inspected. Defendants did not know what records, exactly, Morcaldi had audited. They

13   falsely mischaracterized his audit as "confirming" or "proving" that the invoice in question

14   (Exhibit 1) was fraudulent; but in fact, the report and documents forwarded by Morcaldi never

15   reached any such conclusion. On the contrary, the report and documents showed that Modesto

16   Livestock had purchased the cattle.

17       64.    Defendants were deliberately indifferent to the fact that Chiapetta had submitted a

18   false invoice when he signed the bill of sale under penalty of perjury.

19       65.    Defendants were deliberately indifferent to the invoice in question (Exhibit 1)

20   which states that Modesto Livestock has sold cattle to itself. That document contains truthful

21   information and there is nothing false, fraudulent, or forged about it. Despite characterizing the

22   document as being false (a false bill of sale) Defendants knew that it contained correct and

23   truthful information (i.e., a truthful bill of sale).

24       66.    Defendants were also deliberately indifferent to other facts obtained by Jim

25   Morcaldi in his audit, showing that Modesto Livestock had in fact purchased the cattle at the

26   auction and had paid for the cattle at the auction.

27

28

Complaint                             10

1    67.    For example, the documents supplied by Morcaldi included a copy of a check

2  dated May 17, 1995 written on the Modesto Livestock "Dealer Account", in which Modesto

3  Livestock wrote a check to itself with the legend at the bottom: "trans [transfer] Chiapetta A/R to

4  Dealer".

5    68.    Defendants were deliberately indifferent to the fact that this check was written on

6  the "Dealer Account" of Modesto Livestock, to reflect the fact that the cattle were purchased by

7  Modesto Livestock at its own auction and paid to itself, as the owner of the cattle.

8    69.    Defendants were deliberately indifferent to the fact that the check for the cattle,

9  and the bill of sale for the cattle (Exhibit 1), were consistent with each other and reflected the

10  manner in which Modesto Livestock kept its records in the ordinary course of business.

11    70.    This bill of sale from Modesto Livestock to itself (Exhibit 1) was a valid, genuine

12  document truthfully stating what had transpired – that Modesto Livestock had purchased the

13  cattle in question. Defendants knew that it was a valid, genuine bill of sale.

14    71.    Defendants were deliberately indifferent to the facts concerning the invoice in the

15  possession of Chiapetta (Exhibit 2). They deliberately ignored the face of the document which

16  states that "The purchaser of livestock listed below agrees that the title of said livestock shall be

17  retained by Modesto Livestock Commission Co. until check or draft is paid." They deliberately

18  ignored the fact that this document did not confer ownership on Chiapetta and deliberately

19  misrepresented the facts to the judicial officer when they described the document as showing that

20  Chiapetta was the owner of the cattle.

21    72.    Defendants were deliberately indifferent to their mischaracterization of the

22  invoice in the possession of Chiapetta as the "original invoice", coupled with the conclusion that

23  the invoice in the possession of Gremp was not the original invoice and was therefore falsified.

24    73.    Defendants were deliberately indifferent to the fact that Modesto Livestock, in the

25  ordinary course of business, generated multiple invoices to reflect the transactions that took

26  place during the course of an auction and made no attempt to investigate the type of records that

27  Modesto Livestock generated in the ordinary course of business. Defendants deliberately failed

28

1    to investigate that Modesto Livestock typically and ordinarily used one form of invoice

2    (Exhibit 1) to reflect the fact that Modesto Livestock had purchased cattle at its own auction, for

3    its own account, as a "dealer" in cattle; and typically and ordinarily used another, similar form of

4    invoice (Exhibit 2) to reflect the fact that cattle that it had purchased during the auction were

5    being transferred to Chiapetta or others to raise.

6        74.    Defendants knew that there was no requirement that Modesto Livestock use any

7    particular form to record its transactions and no requirement that any particular form had to be

8    filed with any state agency.

9        75.    Defendants were therefore deliberately indifferent to investigating the forms that

10   Modesto Livestock did use in the ordinary course of business and the circumstances under

11   which those forms were used.

12       76.    Defendants were deliberately indifferent to reporting the correct facts to the

13   judicial officer as to what forms Modesto Livestock used in the ordinary course of business and

14   the circumstances under which the particular forms were used.

15       77.    Without any prior notice, Gremp was arrested at his office over nine years later,

16   on November 11, 2006, by a deputy sheriff in Stanislaus County. At this time, Defendant

17   Cogbill was now Sheriff of Sonoma County. Gremp was handcuffed in front of his wife,

18   employees, and customers, and led away. After spending several hours in custody, he was

19   released. The next date he conducted an auction in front of 4,000 to 8,000 customers, where the

20   reasons for his arrest became the subject of conjecture and speculation. On February 21, 2007,

21   the District Attorney of Sonoma County informed the Superior Court that the case against

22   Gremp was dismissed because of "the insufficiency of the evidence".

23       78.    In causing the arrest and imprisonment of Gremp, the defendants deliberately

24   ignored facts from their own investigation showing that: 1) Modesto Livestock always owned

25   the cattle; 2) Chiapetta never owned the cattle; 3) the invoice in question was not a bill of sale to

26   Chiapetta; 4) the invoice in question was a record showing that the cattle were to be transported

27   to the Chiapetta Ranch; 5) nothing in the invoice stated that it was a bill of sale to Chiapetta;

28

Complaint                          12

1  6) the invoice stated that it was a bill of sale to Modesto Livestock.

2      79.    Furthermore, Defendants knew that there was no probable cause to arrest Gremp
3  for other reasons; or was deliberately indifferent to the lack of probable cause for these other
4  reasons.

5      80.    One such reason is that the offending document in question (Exhibit 1) was not a
6  document that Gremp ever intended to file with a public agency. That document did not fall
7  within the definition of the statute which provides, in relevant part, that "every person who
8  knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in
9  any public office within this state, which instrument, if genuine, might be filed, registered, or
10  recorded under any law of this state or of the United States is guilty of a felony."

11      81.    Gremp never offered a document that was "to be filed, registered or recorded"
12  with the State.

13      82.    Defendants knew, or were deliberately indifferent to, the fact that there was no
14  probable cause to arrest Gremp because he had not offered an instrument that is required to be
15  filed under state law.  Doherty asked Gremp to fax to her the invoice in question. Faxing an
16  invoice to  Doherty did not convert the invoice into an instrument "to be filed, registered, or
17  recorded" in a "public office" of the State. Gremp simply complied with Doherty's request. He
18  did not intend to "file, register, or record" a document in a "public office" of the State. There
19  was no requirement under state law that required Gremp to file Exhibit 1 with a state agency.

20      83.    Defendants knew that Gremp was not required by law to file the invoice with a
21  public office of the State. Defendants also knew that Gremp was not attempting to comply with
22  any filing requirement of state law when he faxed the document to Doherty. Defendants
23  therefore knew, or were deliberately indifferent to the fact that there was no probable cause to
24  arrest Gremp for faxing a document to the state inspector, following the state inspector's request
25  that the document be faxed to her.

26      84.    Defendants also knew of yet another reason why there was no probable cause to
27  arrest Gremp. Defendants knew that a defendant cannot be prosecuted under a general statute

28

Complaint               13

1   when a specific statute covers the same activity.  Defendants knew, or were deliberately

2   indifferent to, the line of legal authority following *People v. Wood*, 161 Cal. App. 2d 24 (1958)

3   which invalidated a felony prosecution under Penal Code section 115 for filing a false

4   document with the Department of Motor Vehicles, because there existed a more specific statute,

5   a misdemeanor, which covered the same offense.

6       85.    Defendant DeLoe wrote in her memo to file on May 7, 1997 that "There are

7   misdemeanor code sections also violated F&A 21709 and 21710 but are beyond the S/L [statute

8   of limitations]. If Def. [defendant] [w]ishes to plea bargain we will offer him these

9   misdemeanors but he needs to waive all irregularities."

10      86.    California Food and Agriculture Code section 21709 provides that "Except as

11  otherwise provided in Section 21706, it is unlawful for any person to possess, or to present to an

12  inspector or peace officer, any invoice of sale or bill of sale that has been altered, defaced, or

13  otherwise changed.".

14      87.    California Food and Agriculture Code section 21710 provides that "it is unlawful

15  for any person to falsify any of the bill of sale information required by Section 21703, or to

16  present such falsified documents to an inspector or peace officer."

17      88.    In his report charging "Falsifying Records", Taylor had listed Penal Code section

18  115, and Food and Agriculture code sections 21709 and 21710. He specifically charged that

19  Gremp had "provided a false bill of sale to Inspector Doherty".

20      89.    Defendants knew, or were deliberately indifferent to the fact that there was a

21  specific misdemeanor provision covering the presentation of a false bill of sale for cattle to a

22  livestock inspector. Defendants also knew, or were deliberately indifferent to the fact that the

23  statute of limitations for prosecution of the more specific misdemeanor statute had already run

24  and that no misdemeanor prosecution could be brought.

25      90.    Defendants also knew that no felony prosecution could be brought under Penal

26  Code section 115, because the only prosecution that could be brought was required to be

27  brought under the specific misdemeanor statute.

28

Complaint                                    14

1    91.    Defendants therefore knew that in presenting documents to the judicial officer in

2    order to obtain an arrest warrant for a felony, Defendants knew there was no probable cause to

3    obtain the arrest warrant.

4    92.    Finally, the Defendants acted with deliberate indifference to Gremp's rights when

5    they made no attempt to arrest him but nevertheless placed his name on a computerized list of

6    persons to be arrested and left his name on that list for over nine years.

7    93.    The County acted with reckless indifference to Gremp's rights to be free from

8    false arrest and imprisonment by failing to train its employees and investigators how to

9    investigate alleged crimes involving the sale of livestock; the submission of false documents to

10   state officials; civil contracts; and bills of sale.

11                          **FIRST CLAIM FOR RELIEF**

12                          (42 U.S.C. section 1983)

13   94.    Plaintiff repeats the foregoing allegations as if fully set forth herein.

14   95.    Lary W. Gremp has been working since he was seventeen years of age. His

15   reputation for honesty and integrity is essential to working as an auctioneer in the livestock

16   community.

17   96.    On June 10, 1997, the Sonoma County Sheriff filed a warrant and felony

18   complaint in the Municipal Court of California, County of Sonoma, charging Gremp with these

19   crimes:

20        1)    violation of Penal Code section 115 (a), on September 29, 1995,  procuring and

21              offering  a false and forged instrument to be filed, registered, and recorded in a

22              public office within this state;

23        2)    violation of Penal Code section 115 (a) on February 29, 1996, procuring and

24              offering a false and forged instrument to be filed, registered, and recorded in a

25              public office within this state. See Exhibit 1 for the document in question.

26   97.    On November 11, 2006 Lary W. Gremp was subjected to a false arrest, without

27   probable cause, and false imprisonment, pursuant to a warrant issued by the Sheriff of Sonoma

28

Complaint                              15

1  County. Prior to his arrest, Gremp was assisting a deputy sheriff in Stanislaus County on a

2  matter unrelated to these proceedings. The sheriff asked for identification and a driver's license,

3  which Gremp provided. Gremp then left and went to his office. Shortly thereafter, the sheriff's

4  deputy checked the computer in his car and drove to Gremp's office, where he placed Gremp

5  under arrest and put him in handcuffs. The arrest took place in front of Gremp's wife, employees

6  and customers.

7      98.    Gremp, his wife, employees and customers were all in shock; they had no idea

8  what Gremp had done to cause his arrest.

9      99.    Gremp was put in the patrol car and taken to the local jail, in handcuffs, where he

10  remained for several hours, until his wife was able to arrange bail.

11      100.    Gremp was eventually released on bail and told to appear in court, in Sonoma

12  County.

13      101.    The next day, Gremp went to work at the auction, for which 4,000 to 8,000

14  customers had shown up. The arrest was now widely known and widely discussed. There was

15  speculation what Gremp had been arrested for. Gremp was embarrassed and humiliated.

16      102.    Gremp subsequently hired an attorney to represent him in the criminal

17  proceedings in Sonoma County Superior Court.

18      103.    On February 21, 2007, Gremp appeared in Superior Court along with his attorney.

19  The District Attorney of Sonoma County dismissed the charges, informing the Court that the

20  dismissal was "in the interests of justice" because of the "insufficiency of the evidence".

21      104.    The arrest was without probable cause for several reasons. There was no false

22  instrument, no false document, and no forged document. The supposedly false document

23  (Exhibit 1) is simply a document showing that cattle bought by Modesto Livestock were to be

24  shipped to Chiapetta to be raised by Chiapetta. Defendants, without a proper or adequate

25  investigation, arbitrarily concluded that Gremp did not own the cattle; that Chiapetta owned the

26  cattle; that Gremp had falsified a bill of sale; and that Gremp was pretending to own cattle that

27  he did not own.

28

Complaint                                16

1    105.    These assumptions were unreasonable and arbitrary, since the written

2  documentation in the possession of the Defendants before applying for a warrant showed that:

3  1) Modesto Livestock owned the cattle; 2) Chiapetta never owned the cattle; 3) Chiapetta never

4  even claimed to own the cattle; and 4) the offending document, on its face, shows a "sale" from

5  Modesto Livestock to Modesto Livestock – i.e., a "sale" from itself to itself, for delivery to

6  Chiapetta.

7    106.    The document in question is not a bill of sale to Chiapetta and is not false. The

8  document is on the letterhead of Modesto Livestock Commission Co. and contains these

9  notations:

10          **"Sold to**: Modesto Livestock Comm. Co.

11          **Destination**: Chiapetta Ranch – Petaluma Ca."

12    107.    This invoice is not a bill of sale to Chiapetta. It is simply proof of Modesto

13  Livestock Commission Co.'s ownership of cattle that were to be delivered to the Chiapetta

14  Ranch.

15    108.    The criminal charges were based upon an arbitrary and unreasonable assumption

16  that the invoice in question is a "bill of sale" from Modesto Livestock to Chiapetta which on its

17  face states the buyer as Modesto Livestock Commission Co.

18    109.    This assumption flies in the face of the very facts in the investigative file of the

19  County, as shown in memos in the file.

20    110.    No person, sheriff, or prosecutor could reasonably believe that the bill of sale was

21  for a sale to Chiapetta, much less that it was a false bill of sale, or that it showed that Modesto

22  Livestock Commission Co. was pretending to own Chiapetta's cattle.

23    111.    There was never a sale to Chiapetta. There was never a transfer of ownership to

24  Chiapetta. There simply was a transfer of possession – the cattle were delivered to Chiapetta to

25  raise, as was reflected on the document in question (Exhibit 1).

26    112.    The District Attorney stated in court on February 21, 2007 that there was

27  "insufficient evidence" to prosecute Gremp. The same "insufficient evidence" which the District

28

Complaint                                    17

1    Attorney had in the file on February 21, 2007 was the same "insufficient evidence" which

2    existed in June, 1997, when Defendants supplied information to obtain an arrest warrant from the

3    judicial officer.

4        113.    Defendants knew that there was no probable cause for the arrest or imprisonment

5    of Gremp and deliberately sought to have him imprisoned on charges that they knew to be false.

6    They also knew that felony charges were not allowed in these circumstances. Alternatively, they

7    were "deliberately indifferent" as to whether there was probable cause or not.

8        114.    Furthermore, the Sheriffs of Sonoma County made no attempt to arrest Gremp at

9    all. The long delay between the date of the filing of charges (June 10, 1997) and the date of

10   actual arrest ( November 11, 2006) was unreasonable and advanced no proper police purpose.

11   This delay of more than nine years deprived Gremp of his right to a speedy trial, even assuming,

12   arguendo, there was any legitimate basis for the arrest in the first place. Such a delay caused

13   prejudice to Gremp in defending himself, a delay that the defendants knew was unreasonable and

14   knew could not result in a successful prosecution.

15       115.    The Sheriffs of Sonoma County allowed Gremp's name to remain on a

16   computerized list of people to be arrested for an unreasonable amount of time. No effort was

17   made to arrest him or to remove his name from the record of people who should be arrested.

18   This excessive delay is another reason why the arrest lacked probable cause.

19       116.    On information and belief, the Sheriff of Sonoma County has no system in place

20   to remove the names of persons who cannot be arrested, due to the passage of time or the

21   expiration of the statute of limitations, from a computerized list of persons to be arrested which

22   is disseminated to law enforcement officials statewide. The Sheriff is "deliberately indifferent"

23   as to whether innocent persons will be arrested under these circumstances or will be prejudiced

24   by delay in bringing a case to a "speedy trial".

25       117.    Defendants acted under color of state law to deprive Plaintiff of rights, privileges

26   and immunities secured by the Constitution of the United States, including the Fourth and

27   Fourteenth Amendments.

28

Complaint                                    18

1      118.    Plaintiff has suffered loss of liberty, shame, humiliation, embarrassment, and

2   injury to reputation, and other damages.

3                              **SECOND CLAIM FOR RELIEF**

4                                      (False Arrest )

5      119.    Plaintiff repeats the foregoing allegations as if fully set forth herein.

6      120.    Plaintiff has been subjected to a false arrest, without probable cause and has

7   suffered injuries therefrom, including  loss of liberty, shame, embarrassment, humiliation, and

8   injury to reputation, and other damages.

9                               **THIRD CLAIM FOR RELIEF**

10                                  (False Imprisonment)

11     121.    Plaintiff repeats the foregoing allegations as if fully set forth herein.

12     122.    Plaintiff has been subjected to false imprisonment, without probable cause, and

13  has suffered injuries therefrom, including loss of liberty, shame, embarrassment and injury to

14  reputation, and other damages.

15

16     WHEREFORE, Plaintiff prays  for judgment as follows:

17  1.    Compensatory Damages;

18  2.    Punitive Damages;

19  3.    Attorneys' Fees and Cost of Suit;

20  4.    Injunctive relief requiring Defendants Sonoma County and Cogbill to adopt a

21  system of review that will prohibit the arrest and imprisonment of persons whose arrest is time-

22  barred or barred by lack of probable cause; and to properly train its investigators in the sale of

23  livestock; the submission of false documents to state officials; civil contracts; and bills of sale.

24

25

26

27

28

Complaint                              19

1    PLAINTIFF REQUESTS TRIAL BY JURY.

2

3                          Respectfully Submitted,

4                          STANZLER FUNDERBURK & CASTELLON LLP

5

6                          By: _____
                               Jordan S. Stanzler
7                              Attorneys for Plaintiff
                               Lary W. Gremp
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     Complaint                              20




**JS 44** (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

**EDL**

LARY W. GREMP

### DEFENDANTS

SARAH LITTLE, PATRICK TAYLOR, GLENN H. VAN SCHAACK, KATHLEEN DELOE, SONOMA COUNTY and BILL COGBILL

**(b)** County of Residence of First Listed Plaintiff **STANISLAUS**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jordan S. Stanzler, Stanzler Funderburk & Castellon LLP, 2275 East Bayshore Rd., Suite 100, Palo Alto, CA  94303 650 739-0200

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☒ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. section 1983

Brief description of cause:
False arrest; false imprisonment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
April 30, 2008

SIGNATURE OF ATTORNEY OF RECORD